```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 4, 2015
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

MARY ELLEN CHEPAK,                         :
                                           :
                        Plaintiff,         :
            -v-                            :        11-cv-9698 (KBF)
                                           :
NEW YORK CITY HEALTH AND                   :        OPINION & ORDER
HOSPITALS CORPORATION,                     :
                                           :
                        Defendant.         :

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

On December 29, 2011, <u>pro se</u> plaintiff Mary Ellen Chepak ("plaintiff" or

"Chepak") filed this action against her former employer ("Metropolitan Hospital" or

"defendant"),[1] alleging gender-based wage discrimination in violation of the Equal

Pay Act ("EPA"), 29 U.S.C. § 206 <u>et seq.</u>; Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>; and the New York State Human Rights Law

("NYSHRL"), N.Y. Exec. Law § 290 <u>et seq.</u>  (ECF No. 2 ("Compl.").)[2]  On October 27,

2014, after a trip to the Second Circuit and back, defendant filed a motion for

summary judgment.  (ECF No. 40.)  That motion became fully briefed on November

---

[1] In an accompanying Order, the Court directed the Clerk of Court to amend the caption in this action to reflect that the defendant is the New York City Health and Hospitals Corporation ("HHC"), not Metropolitan Hospital.  Metropolitan Hospital, where plaintiff worked, is one of the entities operated by HHC.

[2] The Complaint also asserts retaliation claims under Title VII and the NYSHRL.  On March 29, 2013, Judge Griesa dismissed plaintiff's retaliation claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to plausibly allege an adverse employment action.  See <u>Chepak v. Metro. Hosp.</u>, No. 11 Civ. 9698(TPG), 2013 WL 1285270, at *4 (S.D.N.Y. Mar. 29, 2013), <u>vacated on other grounds</u>, 555 F. App'x 74 (2d Cir. 2014) (summary order).  The Second Circuit agreed that Chepak failed to state a retaliation claim, but noted that she should be given an opportunity to amend her Complaint.  See <u>Chepak v. Metro. Hosp.</u>, 555 F. App'x 74, 77 (2d Cir. 2014).  Plaintiff has not attempted to file an Amended Complaint on remand.  Accordingly, the Court deems the retaliation claims dismissed and limits this Opinion & Order to plaintiff's gender-based wage discrimination claims.

24, 2014.  (ECF No. 59.)  On November 25, 2014, the Court informed the parties

that it would grant defendant's motion for summary judgment and issue its decision

in a separate order.  (See ECF No. 60.)  This Opinion & Order sets forth the

predicted order and rationale for the Court's decision.

I.     BACKGROUND

Plaintiff worked at Metropolitan Hospital as a social worker from November

6, 2006 to March 29, 2009, when she voluntarily resigned.  Plaintiff's title was

"Social Worker I," and her salary was determined by a collective bargaining

agreement.  Plaintiff became dissatisfied with her salary in 2007, when a colleague

allegedly told her about two higher-paid male employees who had worked at

Metropolitan Hospital in a different capacity—as Coordinating Managers—several

years earlier.  Plaintiff's gender-based wage discrimination claims in this action are

based on a comparison of her salary to the salaries of these two Coordinating

Managers.

Plaintiff interviewed for a position at Metropolitan Hospital in the spring of

2006 with Richard Siegel ("Siegel"), the Senior Associate Director of Social Work at

Metropolitan Hospital, and Angela Montague ("Montague"), the Assistant Director

of Social Work at Metropolitan Hospital.  (Defendant's Local Civil Rule 56.1

Statement of Undisputed Material Facts ("Def.'s 56.1") ¶ 16, ECF No. 41.)  The

Complaint alleges that plaintiff's position "had been formerly occupied by males"

(Compl. ¶ 13) and that plaintiff was told that "one male had worked for several

years in the position, and another male took his place in that same position"

2

(Compl. ¶ 15).  The Complaint further alleges that "[p]laintiff was told that she was to do the exact same job and be responsible for the exact same duties, as the males that previously held the same position."  (Compl. ¶ 15.)

When describing her interview at her deposition, plaintiff mentioned only learning about one previous male employee.  Plaintiff testified that she was told that "the position that [she] was filling was formerly filled by a male and that [she] would be providing services on the weekend."  (Pl.'s Dep. 106:22-25, ECF Nos. 43-51 ("Yi Decl.") Ex. B.)[3]  She also testified that she did not learn the name of this male employee at the interview.  (See Pl.'s Dep. 107:16-21.)

Plaintiff's personnel file indicates that Metropolitan Hospital had two vacant Social Worker positions at the time of plaintiff's interview: a full-time position and a part-time weekend position.  (See Def.'s 56.1 ¶ 18; Yi Decl. Ex. L.)  The file indicates that these positions were needed to meet the hospital's "immediate service needs" of assessing patients and ensuring that patients received safe and prompt discharges.  (See Def.'s 56.1 ¶ 18; Yi Decl. Ex. L.)  Plaintiff alleges that she had "no knowledge of two positions even being available at the time of her interview or hire."  (Opposition to Statement of Undisputed Material Facts ¶ 2, ECF No. 58.)

A Personnel Requisition Form produced in discovery indicates that Chepak was a "replacement" for an employee named Mejo Kallamthandam ("Kallamthandam"), who had resigned on September 1, 2005.  (Yi Decl. Ex. O at HHC000067.)  The "position title" for both Kallamthanam and Chepak is listed as

---

[3] The Declaration of Gloria M. Yi spans several docket entries (ECF Nos. 43 through 51).  The Court refers to these documents collectively as "Yi Decl."

"Social Worker."  (See id.)  A Personnel Action Form, also produced in discovery,

confirms that Chepak was a "replacement" for Kallamthanam.  (Id. at HHC000068.)

Siegel testified as follows regarding how Chepak's position was created:

> To the best of my recollection and knowledge, I along with my
> supervisor at the time, determined based on patient and hospital need
> that an additional social worker was needed during the weekend.  We
> determined that the Social Work I title was the appropriate title for
> the position as there had been a vacant Social Work I position that
> could be converted to the weekend position and back-filled.
> Additionally, the Coordinating Manager title implies some supervisory
> or administrative responsibilities, and as the weekend role being filled
> involved only direct clinical social work without any administrative or
> supervisory responsibilities, we determined the Social Work I title was
> the appropriate title for the new position.

(Deposition of Richard Siegel by Written Questions ("Siegel Dep.") ¶ 38, Yi Decl. Ex.

C.)

In 2006, when plaintiff was hired, the annual salary for all Social Work I

employees was fixed at $44,125.00 pursuant to a collective bargaining agreement.[4]

(See Def.'s 56.1 ¶¶ 8, 10, 19.)  At the time she accepted defendant's offer of

employment, plaintiff knew that she was accepting a Social Work I position; that

her annual salary would be $44,125.00; and that the position was unionized and

subject to a collective bargaining agreement.  (See Def.'s 56.1 ¶ 20; Pl.'s Dep.

118:10-16, 119:14-17; Compl. ¶ 17.)  Richard DeLaGarza ("DeLaGarza"), a male

social worker who was hired in August 2006, also received an annual salary of

$44,125.00.  (Def.'s 56.1 ¶ 43.)  The Social Work I salary was increased twice before

plaintiff's resignation: to $48,765.00 in 2007 and to $52,745.00 in 2009.  (See id. ¶¶

---

[4] Unlike the Social Work I position, the Coordinating Manager position was exempt from collective
bargaining representation until May 15, 2006.  (See Def.'s 56.1 ¶¶ 4, 12-13.)

4

35, 60.)  Plaintiff and DeLaGarza both earned $52,745.00 per year at the time of plaintiff's resignation.  (See id. ¶¶ 43, 60.)

Plaintiff alleges that a female Coordinating Manager, Obdulia Fontanez ("Fontanez"), told her in 2007 that two male Coordinating Managers—Almando Infante ("Infante") and Mohamed Meyo ("Meyo")—had previously worked at Metropolitan Hospital and earned approximately $35 per hour, which was at least $10 per hour more than what plaintiff was earning.  (See Pl.'s Dep. 129:10-130:25; Compl. ¶¶ 19-20.)

In discovery, plaintiff took Fontanez's deposition by written questions.  (See Deposition of Obdulia Fontanez by Written Questions ("Fontanez Dep."), Yi Decl. Ex. E.)  Fontanez testified that she had worked with Infante and Meyo (see id. ¶¶ 7, 13) and that she "believe[d]" that their job duties were the same as her own duties and those of plaintiff:

> Question:    What were [Infante's] duties?
>
> Response:    I believe that Alan Infante had the same duties as I did, but during a different tour.
>
> . . .
>
> Question:    What were [Meyo's] duties?
>
> Response:    I believe he had the same duties as Mr. Infante.
>
> . . .
>
> Question:    Did Mary Chepak perform the same duties as Almando Infante and Mohamed Meyo or any other Coordinating Manager during or prior to her tenure at Metropolitan hospital?

5

>    Response:    Yes, I believe Mary Chepak performed the same duties at
>                 Metropolitan Hospital as Mr. Infante, Mr. Meyo, and
>                 myself.

(Id. ¶¶ 9, 15, 19.)  Fontanez did not explain the basis of any of her beliefs as to

Infante's and Meyo's job duties, and acknowledged that she and Infante had covered

different shifts.  (See id. ¶¶ 5, 7.)

Records produced in discovery indicate that Infante worked at Metropolitan

Hospital between March 2001 and August 2003 and received a salary of $30.22 per

hour (approximately $55,000 per year).  (Def.'s 56.1 ¶ 42.)  Metropolitan Hospital

has been unable to identity any employee named Mohamed Meyo.  (See id. ¶¶ 64,

66-67.)  Plaintiff testified that the sole source of her information as to Meyo was

Fontanez.  (Pl.'s Dep. 136:2-5.)   According to an e-mail from Fontanez, Meyo started

working at Metropolitan Hospital about four to five months after Infante resigned,

and left about ten months later.  (Def.'s ¶ 65.)

At her deposition, plaintiff described her job at Metropolitan Hospital as

follows:

>    . . . Well, I worked on the weekends, Saturday and Sunday and
>    Monday.  So on Saturday and Sunday, I covered—I was primarily
>    covering the emergency room.  However, from 5:00 on, I covered the
>    entire hospital, and I worked until 12:00 at night.
>
>    So if there was a problem in pediatrics, they would call me, 'cause I
>    was the only social worker around.  If Obdulia was out, they would call
>    me also.  And sometimes Obdulia was very busy.  And sometimes
>    Obdulia was very busy.  She had certain things, social work duties that
>    she did on the maternity unit, and that was like a big part of what she
>    did.  And so I would—even during the day when she was there, I'd also
>    get called on to work on—to do something on one of the units.  But
>    primarily, I worked in the emergency room.

> And so if somebody came in, I had a beeper.  And if somebody came in and there was a suspicion of domestic violence or child abuse or if there was a problem in psychiatry, they would call me.
>
> So during the course of the day, I could be anywhere from the three different ERs: Pediatrics, psychiatry or the main ER.  And so I would be fielding each different kind of issue that came up from any weekend, you know—I mean we had—we had some sad things that came in.

(Pl.'s Dep. 123:16-124:15.)  Plaintiff acknowledged that her responsibilities at Metropolitan Hospital were limited to patient-related services.  (Pl.'s Dep. 128:1-7; see also Siegel Dep. ¶ 19 (testifying that plaintiff's duties were to "along with a co-worker, provide[] direct patient service to patients in Metropolitan Hospital during the weekend, including the emergency room, and assist[] hospital staff as needed with social work functions").)[5]

When asked whether Chepak had performed "the same duties" as Infante, Montague testified that she "believe[d]" that Chepak and Infante had performed "similar duties" "concerning the provision of direct patient services."  (Deposition of Angela Montague by Written Questions ("Montague Dep.") ¶ 40, Yi Decl. Ex. D.) Montague also testified that "it is [her] understanding that Mary Chepak, Al Infante, and Obdulia Fontanez all provided direct patient service work during the weekend at Metropolitan Hospital."  (Id. ¶ 41.)  However, the Position Description

---

[5] Metropolitan Hospital's "Functional Job Description" for a social worker, which plaintiff signed, lists the following "general duties and responsibilities":

> Under supervision, provides social work services, discharge planning services and coordination of continuing care planning, utilizing a variety of techniques such as individual, family, group work, and community networking to patients serviced at this facility.

(Yi Decl. Ex. P. at HHC000028; see also id. at HHC000040.)  The "Functional Job Description" also includes a list of "specific tasks and responsibilities."  (See id.)

for the "Coordinating Manager" position (the "Position Description") in effect until May 2006 indicates that Coordinating Managers were responsible not only for the provision of direct patient services, but also for various supervisory and administrative tasks.[6]  The Position Description indicates that "[t]his class of positions encompasses supervisory or administrative work of varying degrees of difficulty and with varying degrees of latitude for independent initiative and judgment."  (Yi Decl. Ex. Q at HHC000162.)  The Position Description further indicates that "[t]his class of positions is in the managerial class" (id. at HHC000165) and lists fifteen examples of "typical tasks" of a Coordinating Manager.

Plaintiff testified at her deposition that she never performed eleven of the fifteen tasks listed in the Position Description.  These eleven tasks are[7]:

> 3.    Plans, develops and may conduct training programs to maintain proficiency of staff and use of new equipment and methods.

---

[6] In describing the duties of Infante and Chepak, Montague limited her responses to the provision of direct patient services:

> 21.    What were [the] duties [of Infante and Fontanez]?
>
> Response:        . . . I believe Al Infante and Obdulia Fontanez were both responsible for providing direct patient services for patients at Metropolitan Hospital during the weekend, including performing psychosocial assessments, discharge planning, assisting with providing resources such as carfare vouchers as needed, providing advocacy and referral services, working with patients' families and providing any other assistance a patient may need. . . .
>
> 43.    What were [Chepak's] duties?
>
> Response:        . . . Mary Chepak performed psychological assessments, advocacy and referral services, discharge planning, and assisted patients at Metropolitan Hospital with obtaining other resources including car fare slips as needed.

(Montague Dep. ¶¶ 21, 43.)

[7] The numbers next to these tasks correspond to the numbers in the Position Description.

4.   Allocates staff on basis of workload, space and available equipment.

5.   Participates in budgetary planning, reviews operating costs, performs cost studies and prepares department budgets.

6.   May supervise studies related to the service/program and analyzes modifications and development of systems and procedures to improve department operations.  Makes recommendations and implements.

7.   Coordinates research projects and conducts special studies to evaluate the various rehabilitative programs in department and within the overall objective of the department.

10.  May analyze patient records with attending staff to determine whether they document that the length of stay and medical services rendered are consistent with reimbursement formulas, completing necessary forms.

11.  Ensures that compliance manuals are current and that policies and procedures are followed.

12.  May represent the Department Administrator in external contacts with community groups, organizations and agencies.

13.  Supervises the office administration, and office record keeping activities of the department.

14.  Is responsible for employee supervision, performance and employee development of assigned personnel in areas of responsibility and  accountability.

15.  Supervises the preparation and publication of operational manuals and procedures.

(Id. at HHC000163-64.)  Plaintiff had not performed any of these tasks as a social

worker at Metropolitan Hospital.  (See Pl.'s Dep. 208:11-19, 209:2-14, 211:16-

212:21.)

9

Fontanez testified as follows regarding her duties as a Coordinating

Manager:

> . . . [M]y duties as a coordinating manager in the Social Work
> department include performing administrative duties as far has [sic]
> having to troubleshoot units all over the hospital, screening patients,
> handling all kinds of crises and intervention, conducting patient
> assessments and providing direct client assessments, conducting
> referrals of patients, reporting to supervisors for anything that is not
> patient-related, and working with a team of other doctors and nurses
> and the receptionist when there is something pertaining to a patient to
> coordinate services.

(Fontanez Dep. ¶ 6.)  Fontanez also testified that her duties included serving as a

supervisor for other employees and that she supervised a student in the Social Work

Department between 2012 and 2013.[8]  (Id. ¶ 24.)  By contrast, plaintiff testified that

she never supervised anyone.  (Pl.'s Dep. 207:21-23.)[9]

Plaintiff had requested a salary increase from Siegel on several occasions.

(Def.'s 56.1 ¶ 22.)  On one occasion, Siegel told plaintiff that he may be able to

increase plaintiff's salary if she obtained a LCSW[10] license, but plaintiff has not

obtained such a license.  (Def.'s 56.1 ¶ 23-24.)  Plaintiff testified that, in her view,

Siegel never fully understood the nature of her complaints:

> . . . I don't think he ever got that I was saying that I was interviewed
> for one particular position, and there were other people in that
> position, and then I was hired for another position, and I didn't realize

---

[8] This is consistent with Task # 14 in the Position Description.

[9] Siegel testified about another difference between the duties of Fontanez and Chepak.  While
acknowledging that plaintiff performed "similar duties" as Fontanez, Siegel testified that "[a]s Ms.
Fontanez has more experience at Metropolitan Hospital, she was identified as the point person for the
Administrators on Duty ('AOD') and to staff in the Emergency Room for complicated cases."
(Siegel Dep. ¶ 35.)

[10] "LCSW" is an acronym for "Licensed Clinical Social Worker."

that it wasn't the same position that I was told when I went in to
interview.

(Pl.'s Dep. 158:20-25.)  Plaintiff repeatedly testified that she did not believe that, in
determining her salary, Metropolitan Hospital intentionally discriminated against
her on the basis of gender.  (See Pl.'s Dep. 177:19-22 ("[S]omewhere between that
and the time I came on, I believe there was some kind of change somewhere.  I don't
think it was necessarily, you know, like evil or bad."); id. 188:3-11 ("I don't think
that [Siegel] said she is a female, let me get her less money.  I definitely don't think
that.  I don't know that if it had been a male applying for that position if perhaps
when whatever organizational thing came about and they decided to restructure
because he is new in the regime, and they now found a way to save money while
still accomplishing whatever goal they wanted to accomplish to have somebody on
the weekend."); id. 188:13-17 ("So I don't want to say it's because I'm a female,
'cause I don't think anybody that pays a female less is doing it necessarily
consciously.  I don't think it's that sinister."); id. 189:24-190:1 ("So do I think it was
because of my gender?  No, I think it's just the course of doing business and the way
things work.").)  Plaintiff also testified that she was not aware of anyone else
starting as a Coordinating Manager at Metropolitan Hospital after she was hired.
(See Pl.'s Dep. 180:16-19.)

     After complaining about her salary to Siegel, plaintiff contacted defendant's
internal Equal Employment Opportunity ("EEO") officer, Lois Penn ("Penn").
(Def.'s 56.1 ¶ 46.)  Plaintiff complained to Penn that she was paid "significantly
less" than certain male predecessors, even though she "performed the same job

with, equal skill, effort, and responsibility under similar working conditions." (Id. ¶ 48.)  By letter dated November 13, 2008, Penn informed plaintiff that an investigation had been conducted and that the EEO office had determined that there was no probable cause.  (Id. ¶ 50.)  In particular, Penn explained to plaintiff that she was not hired to replace "Mr. Fonte"[11] and that her position was that of a social worker, not a Coordinating Manager.  (See id. ¶ 51; Yi Decl. Ex. X.)

By letter dated January 1, 2009, plaintiff informed Siegel that she had found a new job beginning at the end of March with a salary of about $40 per hour.  (Def.'s 56.1 ¶ 56.)  Plaintiff's last day at Metropolitan Hospital was March 29, 2009.  (Id. ¶ 61.)

On August 7, 2009, plaintiff filed a charge of discrimination against defendant with the Equal Employment Opportunity Commission ("EEOC"), alleging a violation of Title VII and the EPA.  (Def.'s 56.1 ¶ 62.)  On September 30, 2011, the EEOC notified plaintiff that it was unable to conclude that defendant violated any federal law.  (Id. ¶ 68.)  In particular, the EEOC determined that the "evidence submitted did not demonstrate that the job of the comparators, who were Coordinating Managers," and plaintiff's job, Social Worker, required "equal skill, effort or responsibility."  (Id.)

Plaintiff filed this action on December 29, 2011, alleging gender-based wage discrimination and retaliation in violation of Title VII, the NYSHRL, and the

---

[11] This appears to be a reference to Infante.

EPA.[12]  On March 29, 2013, Judge Griesa dismissed the Complaint in its entirety.

On February 13, 2014, the Second Circuit reversed the dismissal of the

discrimination claims, finding that, in light of Chepak's pro se status, allegations

"that she was given a different title, but required to do the same job for less pay, as

her male predecessors" were sufficient to survive a motion to dismiss.  Chepak, 555

F. App'x at 76.

On October 27, 2014, defendant filed a motion for summary judgment as to

all surviving claims.  That motion is the subject of this Opinion & Order.  For the

reasons set forth below, defendant's motion is GRANTED.

## II.   LEGAL STANDARDS

### A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if its resolution

"might affect the outcome of the suit under the governing law."  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue is "genuine" when "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."  Id.

"The inferences to be drawn from the underlying affidavits, exhibits, interrogatory

answers, and depositions must be viewed in the light most favorable to the party

---

[12] Plaintiff is not new to civil litigation: she has filed at least six other civil lawsuits against various entities, including a university, a restaurant, and a nursing home.  (See Pl.'s Dep. 28:18-44:7.)  This is also not plaintiff's first lawsuit against an employer: plaintiff sued Dominican Sisters, where she worked after leaving Metropolitan Hospital, alleging that she was fired while on family leave.  (See Pl.'s Dep. 32:1-33:19.)

opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citations omitted).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party is not required to offer affirmative evidence negating the opposing party's case. Id. It may meet its burden by showing that there is insufficient evidence in the record for a rational trier of fact to find for the nonmoving party. See id. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."); see also id. at 322-23 ("[T]he plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); F.D.I.C. v. Giammettei, 34 F.3d 51, 54 (2d Cir. 1994) ("While whatever evidence there is to support an essential element of an affirmative defense will be construed in a light most favorable to the non-moving defendant, there is 'no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.'" (quoting Celotex, 477 U.S. at 323)).

14

Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." Anderson, 477 U.S. at 256. He or she "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation mark omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("[The] opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (citations omitted)); Fujitsu Ltd. v. Fed. Exp. Corp., 247 F.3d 423, 428 (2d Cir. 2001) ("[T]he nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." (quoting Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998)) (internal quotation marks omitted)). Although the evidence is viewed in favor of the non-moving party, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Anderson, 477 U.S. at 252) (internal quotation marks omitted). The Second Circuit has made clear that it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context

15

of discrimination cases." <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001).

    B.    <u>The EPA</u>[13]

Congress passed the EPA "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." <u>Belfi v. Prendergast</u>, 191 F.3d 129, 135 (2d Cir. 1999). "From the first, the EPA concerned equal pay for—emphatically—<u>equal</u> work." <u>E.E.O.C. v. Port Auth. of N.Y. & N.J.</u>, 768 F.3d 247, 254 (2d Cir. 2014) (emphasis in original). "To that end, Congress rejected statutory language encompassing 'comparable work' to instead mandate equal pay for 'equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" <u>Id.</u> (quoting 29 U.S.C. § 206(d)(1)).

"To prove a violation of the EPA, a plaintiff must first establish a <u>prima facie</u> case of discrimination by showing: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.'" <u>Belfi</u>, 191 F.3d at 135 (quoting <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1310 (2d Cir. 1995), <u>abrogated on other grounds by</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742 (1998)). The plaintiff need not prove discriminatory intent to prevail on an EPA claim. <u>Belfi</u>, 191 F.3d at 136.

---

[13] To the extent the Complaint can be construed to allege a claim under the New York State Equal Pay Act, that claim may be evaluated under the same standard as the federal EPA claim. <u>See</u> <u>Rose v. Goldman, Sachs & Co.</u>, 163 F. Supp. 2d 238, 243 (S.D.N.Y. 2001).

While the plaintiff need not demonstrate that his or her job was "identical" to a higher-paid position to make out a prima facie case, "the standard is nonetheless demanding, requiring evidence that the jobs compared are 'substantially equal.'" E.E.O.C., 768 F.3d at 255 (citation omitted).  Jobs that are merely "comparable" are insufficient to satisfy the prima facie case.  Tomka, 66 F.3d at 1310; see also Francoeur v. Corroon & Black Co., 552 F. Supp. 403, 407 (S.D.N.Y. 1982) ("[P]laintiff cannot show merely that two jobs are comparable and that the wage differential between them is unjustified by the comparable worth of each job to the employer." (citing Hodgson v. Corning Glass Works, 474 F.2d 226, 231 (2d Cir. 1973))).

Although application of the EPA hinges on actual job content rather than the employer's job descriptions, the job descriptions are evidence—"often exceedingly good evidence"—of actual job content, with either party open to show contrary.  See Hodgson, 474 F.2d at 234 n.10.  While the Second Circuit has "indicated that questions regarding the equivalence of two positions pursuant to an EPA claim are best left to the trier of fact," summary judgment is appropriate where there is "no basis in the record for the equivalency argument advanced by" plaintiff.  Price v. Mount Sinai Hosp., 458 F. App'x 49, 52 (2d Cir. 2012) (citation omitted).

Once the plaintiff makes out a prima facie case, the burden of persuasion shifts to the defendant to show that the wage disparity is justified by one of four affirmative defenses: "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based

17

on any other factor other than sex." Belfi, 191 F.3d at 136 (quoting 29 U.S.C. §

206(d)(1)) (internal quotation marks omitted).  The "factor other than sex" defense

requires proof that the employer "had a legitimate business reason for

implementing the gender-neutral factor that brought about the wage differential."

Id. (citations omitted).

The plaintiff may then "counter the employer's affirmative defense by

producing evidence that the reasons the defendant seeks to advance are actually a

pretext for sex discrimination."  Id. (citation omitted).  "The appropriate inquiry to

determine if the factor put forward is a pretext, is whether the employer has use[d]

the factor reasonably in light of the employer's stated purpose as well as its other

practices."  Id. (quoting Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d

Cir. 1992)) (internal quotation marks omitted).

An EPA claim "must be commenced within two years of its accrual, or three

years if the violation is willful."  Pollis v. New Sch. for Soc. Research, 132 F.3d 115,

118 (2d Cir. 1997) (citing 29 U.S.C. § 255(a)).  "For purposes of the statute of

limitations inquiry, '[a] new claim accrues each time an employee receives a

paycheck under a discriminatory wage policy, but the policy's existence does not

make the violation a "continuing" one, such that the plaintiff can seek backpay

beyond the statutory period of two or three years.'"  Virgona v. Tufenkian Imp.-Exp.

Ventures, Inc., No. 05 CIV.10856 GEL, 2008 WL 4356219, at *7 (S.D.N.Y. Sept. 23,

2008) (quoting Downes v. JP Morgan Chase & Co., No. 03 CIV.8991(GEL), 2004 WL

1277991, at *7 (S.D.N.Y. June 8, 2004)).  A violation is not "willful" unless "the

employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988); see also Virgona, 2008 WL 4356219 at *7 ("[A]n employer acts willfully where 'the proof shows that an employer was indifferent to the requirements of the governing statute and acted in a purposeful, deliberate, or calculated fashion.'" (quoting Benjamin v. United Merchants & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir. 1989))). "If an employer acts unreasonably, but not recklessly, in determining its legal obligation," then the violation is not "willful." McLaughlin, 486 U.S. at 135 n.13.

C.      Title VII and the NYSHRL[14]

"The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies." Lavin-McEleney v. Marist Coll., 239 F.3d 476, 483 (2d Cir. 2001) (citation omitted). "A key difference between them . . . is that a Title VII disparate treatment claim requires a showing of discriminatory intent, while an Equal Pay Act claim does not." Id. (citing Belfi, 191 F.3d at 135).

Employment discrimination claims under Title VII are analyzed under the burden-shifting framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). Belfi, 191 F.3d at 139. Under that framework, the plaintiff

---

[14] "[C]laims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997) (citation omitted). Accordingly, the Court addresses Chepak's Title VII and NYSHRL claims together.

bears the initial burden of establishing a prima facie case of discrimination.  In order to establish a prima facie case of unequal pay for equal work under Title VII, a plaintiff must show: (1) that he or she was a member of a protected class; (2) that "she was paid less than non-members of her class for work requiring substantially the same responsibility"; and (3) that there is evidence of discriminatory animus. See Belfi, 191 F.3d at 139 (citations omitted); see also id. ("In addition to the requirements that are generally the same as those under the EPA, 'a Title VII plaintiff must also produce evidence of discriminatory animus in order to make out a prima facie case of intentional sex-based salary discrimination.'" (quoting Tomka, 66 F.3d at 1313).

If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Burdine, 450 U.S. at 253 (citation omitted).  "[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Id. (citation omitted).  "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. (citations omitted).

III.    DISCUSSION[15]

Plaintiff has failed to establish a triable issue as to a fundamental requirement of any of her claims: that she held a substantially equal job for which she was paid less than males filling that role.  Plaintiff held a Social Work I title, but compares her salary to that of male predecessors (one of whom there is no record of) who held different job titles with different job descriptions years before plaintiff started working at Metropolitan Hospital.  Plaintiff concedes that she did not perform eleven of the fifteen tasks listed in the job description for the Coordinating Manager position.

The undisputed record shows that there was at least one male employee—DeLaGarza—who had the same title (Social Work I) and worked at Metropolitan Hospital contemporaneously with plaintiff.  Plaintiff and DeLaGarza received the same annual starting salary of $44,125.00 and the same periodic increases in salary through 2009, when plaintiff resigned.

Plaintiff does not dispute any of these facts, but argues that Infante and Meyo are appropriate comparators because social workers and Coordinating Managers have the same actual duties, job descriptions notwithstanding.  Plaintiff is correct that what matters under the law is actual job content, rather than job descriptions.  See, e.g., Kassman v. KPMG LLP, 925 F. Supp. 2d 453, 471 (S.D.N.Y.

---

[15] At the outset, the Court notes that plaintiff's EPA claim is time-barred to the extent it seeks damages incurred before December 29, 2008—three years before plaintiff filed the instant action. See Pollis, 132 F.3d at 118 ("[A] claim under the Equal Pay Act must be commenced within two years of its accrual, or three years if the violation is willful.").  Similarly, plaintiff's Title VII claim is barred to the extent it seeks damages incurred before October 11, 2008—300 days before plaintiff filed her EEOC charge.  See Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 114-15 (2002).

2013).  However, job descriptions are evidence—"often exceedingly good evidence"—of actual job content, with either party open to show contrary.  See Hodgson, 474 F.2d at 234 n.10.  Here, plaintiff has not offered any non-conclusory evidence that the actual job content of her comparators' positions was "substantially equal" to her own job content in skill, effort, or responsibility.

To start, plaintiff cannot establish a prima facie case of unequal pay using Meyo as a comparator.  Metropolitan Hospital does not have any records indicating that an employee named Mohamed Meyo ever worked at Metropolitan Hospital.  Both Siegel and Montague testified that they are unaware of anyone by that name.  (See Siegel Dep. ¶ 12; Montague Dep. ¶ 27.)

Plaintiff's evidence of substantial equality as to Infante consists of (1) Fontanez's testimony that she "believe[d]" that Chepak performed "the same duties" as Infante, Meyo, and herself; (2) plaintiff's own statement that she was told during her interview that "she was to do the exact same job and be responsible for the exact same duties, as the males that previously held the same position" (Compl. ¶ 15); and (3) Montague's descriptions of the duties of social workers and Coordinating Managers, and testimony that she "believe[d]" that Chepak and Infante had performed "similar duties" "concerning the provision of direct patient services" (Montague Dep. ¶ 40).  These assertions fail to raise a triable issue of fact.

Inquiry into whether jobs are "substantially equal" in skill, effort, and responsibility does not end with a comparison of substantive duties.  It is not uncommon that two employees perform certain tasks together but only one is held

accountable for the results.  In this situation, the employees may be said to perform the same duties, but their jobs are not substantially equal in responsibility.  See 29 C.F.R. § 1620.17 ("Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation.").  Here, plaintiff has not produced any evidence as to the relative accountability of her position and that of Infante.

In any event, plaintiff has not offered any competent evidence suggesting that her duties were substantially the same as those of Infante.  Plaintiff's allegations as to what Fontanez told her about Infante (or Meyo) is inadmissible hearsay.  Fontanez's deposition testimony is entirely conclusory—she simply states that she "believes" that Chepak, Infante, and Meyo performed "the same duties" without offering any factual basis for what is at best her opinion.  Metropolitan Hospital has been unable to identify any employee named Mohamed Meyo, and Fontanez herself acknowledged that she and Infante had covered different shifts, precluding the possibility that Fontanez personally observed Infante perform all of his duties.  In fact, Montague testified that Infante and Fontanez worked in different areas of the hospital: Infante "covered the in-patient psychiatry unit" and Fontanez "covered the emergency room."  (Montague Dep. ¶ 21.)  Chepak may not rely on the unsubstantiated "beliefs" of a coworker without firsthand knowledge to defeat summary judgment.  See Fujitsu, 247 F.3d at 428 ("[T]he nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." (quoting Scotto, 143 F.3d at 114) (internal quotation marks omitted)); Heublein, Inc. v.

United States, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations."); Sec. & Exch. Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978) ("The party opposing the motion must set forth 'concrete particulars,' and cannot make a secret of his evidence, holding it close to his chest until the trial." (citations omitted)).

Plaintiff's allegation that she was told during her interview that "she was to do the exact same job and be responsible for the exact same duties, as the males that previously held the same position" (Compl. ¶ 15) also does not raise any triable issue of fact.  Plaintiff testified at her deposition that Montague told her that she was a replacement for a male employee but did not reveal the employee's name.  Plaintiff assumes that Montague was referring to Infante, but this assumption is without factual basis.  Defendant has produced documents—whose authenticity plaintiff does not dispute—explicitly stating that plaintiff was hired as a replacement for Kallamthandam, whose title is listed as "Social Worker."  In light of this evidence, no reasonable jury would infer that Montague referred to Infante, rather than Kallamthandam, when discussing plaintiff's predecessor.

Finally, Montague's deposition testimony does not raise any triable issue of fact.  Montague testified only about a subset of the duties of a Coordinating Manager—those related to the provision of patient-related services—and, even as to this subset of duties, Montague testified only that she "believe[d]" that plaintiff and Infante performed "similar duties."  (Montague Dep. ¶ 40 (emphasis added).)  She did not testify about whether Infante had additional supervisory and/or

24

administrative duties, nor about his level of accountability as a Coordinating
Manager.  At most, Montague's testimony suggests that there was some overlap in
Infante's and Chepak's duties, but the law is clear that jobs that are merely
"comparable" are insufficient to satisfy plaintiff's prima facie case.  See, e.g., Tomka,
66 F.3d at 1310.  Rather, plaintiff must produce evidence that the jobs were
"substantially equal" in skill, effort, and responsibility.

In sum, plaintiff has not established a prima facie case of unequal pay: there
is no basis in the evidentiary record for plaintiff's argument that her Social Work I
position was substantially equal to the Coordinating Manager positions of her
proposed comparators.  There is likewise no evidence that Chepak, Infante, and
Meyo performed their jobs "under similar conditions."

Even if plaintiff had established a prima facie case, summary judgment still
would be appropriate because defendant has shown that the challenged wage
disparity is justified by a "factor other than sex," see 29 U.S.C. § 206(d)(1), for which
defendant had a legitimate business reason.  Specifically, defendant has put
forward evidence that the weekend position that plaintiff ultimately filled was
created after a male social worker resigned, and the vacancy was converted into a
weekend position to meet Metropolitan Hospital's "immediate service needs."  Siegel
testified that he and a fellow supervisor had determined that "Social Work I" was
the appropriate title for the new position because the position was created from a
Social Work I vacancy, and "the weekend role being filled involved only direct
clinical social work without any administrative or supervisory responsibilities."

25

(Siegel Dep. ¶ 38.)  Once the position's title was determined, its salary was fixed by a collective bargaining agreement.

While plaintiff disputes the circumstances under which her position was created,[16] plaintiff has not produced any evidence suggesting that defendant's proffered justification is pretextual.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be "a pretext for discrimination" unless it is shown both that the reason was false, and that discrimination was the real reason." (emphasis in original)).  Indeed, plaintiff's deposition testimony undercuts any claim of pretext: plaintiff testified that, in her view, she was paid less not "because of [her] gender," but simply as a result of "doing business and the way things work."  (Pl.'s Dep. 189:24-190:1.)  Accordingly, summary judgment is appropriate as to plaintiff's EPA claim.[17]

---

[16] Plaintiff alleges that she was told at her interview that her position was "created to fill a need when the hospital failed an evaluation by a regulatory agency several years back."  (Compl. ¶ 14; see also Pl.'s Dep. 106:1-7, 107:22-108:5.)

[17] Even if plaintiff's EPA claim survived summary judgment on the merits, this claim—filed over two years after plaintiff resigned—must be dismissed as untimely.  On the record before the Court, no reasonable jury could conclude that any violation of the EPA was "willful."  Plaintiff's sole evidence of willfulness is that she complained to Siegel about her salary on several occasions.  However, plaintiff testified that Siegel never fully understood the nature of the complaints:

> I don't think he ever got that I was saying that I was interviewed for one particular position, and there were other people in that position, and then I was hired for another position, and I didn't realize that it wasn't the same position that I was told when I went in to interview.

(Pl.'s Dep. 158:20-25.)  There is no evidence that Siegel, or anyone else at Metropolitan Hospital, knew or showed reckless disregard for the fact that Chepak was entitled to a higher salary under the EPA.  See McLaughlin, 486 U.S. at 133, 135 n.13 (A violation is not "willful" unless the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Id. at 133.  "If an employer acts unreasonably, but not recklessly, in determining its legal obligation," then the violation is not "willful."  Id. at 135 n.13.).

Plaintiff's claims under Title VII and the NYSHRL must be dismissed for the same reasons.  See Lavin-McEleney, 239 F.3d at 483 ("The Equal Pay Act and Title VII must be construed in harmony, particularly where claims made under the two statutes arise out of the same discriminatory pay policies." (citation omitted)).  In addition, summary judgment is independently warranted as to the Title VII and NYSHRL claims because plaintiff has not produced any evidence of a discriminatory intent.  See id. ("[A] Title VII disparate treatment claim requires a showing of discriminatory intent." (citing Belfi, 191 F.3d at 135)).  Plaintiff repeatedly testified at her deposition that she did not believe that she was a victim of intentional discrimination.

IV.    CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is GRANTED.  The Clerk of Court is directed to terminate the motion at ECF No. 40 and to terminate this action.

SO ORDERED.

Dated:        New York, New York
              February 4, 2015

_____
KATHERINE B. FORREST
United States District Judge

CC:
Mary Ellen Chepak
22 Spar Dr.
Mastic Beach, NY 11951

27